People v Hemphill (2019 NY Slip Op 04646)





People v Hemphill


2019 NY Slip Op 04646


Decided on June 11, 2019


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on June 11, 2019

Sweeny, J.P., Manzanet-Daniels, Kern, Singh, JJ.


8849 1221/13

[*1]The People of the State of New York, Respondent,
v
Darryl Hemphill, Defendant-Appellant.


Robert S. Dean, Center for Appellate Litigation, New York (Claudia Trupp of counsel), for appellant.
Darcel D. Clark, District Attorney, Bronx (Jordan K. Hummel of counsel), for respondent.



Judgment, Supreme Court, Bronx County (Steven L. Barrett, J.), rendered January 6, 2016, convicting defendant, after a jury trial, of murder in the second degree, and sentencing him to a term of 25 years to life, affirmed.
Defendant was charged with two counts of second-degree murder in connection with an April 6, 2006 incident in which two-year-old David Pacheco, Jr. was shot and killed by a stray bullet that had entered his mother's minivan as they were driving on Tremont Avenue in the Bronx.
On the date of the incident, which was Easter Sunday, Ronell Gilliam, along with a black male who was wearing a blue sweater or blue shirt, got into a physical fight with a group of men and women in the street around Tremont Avenue. At some point shortly after that altercation, the fatal stray bullet was fired. The police interviewed eyewitnesses, including Michelle Gist, who identified Gilliam as one of the men involved. Police searched Gilliam's apartment and found a blue sweater in a plastic bag.
Soon thereafter, the police suspected that Gilliam's best friend, Nicholas Morris, had been with Gilliam and had committed the shooting. Police searched Morris's apartment and found guns and ammunition, including a 9 millimeter cartridge, the type of ammunition used in the shooting. The next day, Morris appeared on a television news broadcast on Bronx News 12, proclaiming his innocence. Morris was arrested, and police observed bruises on his knuckles consistent with his having been in a fistfight.
At the time of Morris's arrest, at least three witnesses had identified Morris to police as the shooter.
In 2008, Morris was indicted and the prosecution proceeded to trial against him. However, when Morris's DNA was compared to DNA taken from the blue sweater recovered from Gilliam's apartment in 2006, it was determined that there was no match. Thus, in April 2008, the court declared a mistrial in Morris's case with the prosecution's consent. In May 2008, after having served two years in prison, Morris pleaded guilty, against his counsel's advice, to possessing a .357 caliber gun on the day of the shooting, in exchange for his immediate release from prison.
In 2011, the prosecution obtained the DNA of defendant, Gilliam's cousin, and tested it against the DNA found on the blue sweater recovered from Gilliam's apartment in 2006. Defendant's DNA was a match for the DNA found on the sweater. Two years later, in 2013, defendant was arrested and indicted.
At defendant's trial in 2015, 29 witnesses testified for the People, including, among others, the group of people that were involved in the altercation before the shooting; Gist, an eyewitness who had known defendant from the neighborhood and saw him during the fight; three other eyewitnesses to the fight and shooting; Gilliam, defendant's cousin and accomplice; members of defendant's family and one of defendant's friends; and certain police officers and [*2]experts. Photographs, reports, ballistic evidence from the scene and the blue sweater containing defendant's DNA were admitted at trial. One of defendant's friends testified for the defense.
At the trial, the eyewitnesses all described the shooter as a thin African American man wearing a blue shirt or blue sweater and a hat. Some of the eyewitnesses also testified that they observed that the shooter had a tattoo on his right forearm. At some point after these witnesses testified, defendant displayed to the jury his arms revealing "D.A," defendant's nickname and "10453," a zip code, tattooed on his right arm. Additionally, the video of Morris's interview at the News 12 Bronx office was introduced and played to the jury without sound to show that Morris had no tattoos on his arms.
One of the detectives testified that after the shooting, he spoke to Gist, who had recognized two men involved in the fight, Gilliam and Morris. The detective testified that the police gained access to Gilliam's apartment, where they recovered from a closet the blue sweater in a plastic bag. He testified that when he opened the plastic bag, he smelled burnt gunpowder residue. However, lab testing of the sweater was inconclusive as to whether it contained gunpowder residue.
Gist testified that she first told police that three people were present at the initial altercation with the other group - Gilliam, Morris and defendant - but that she only saw Gilliam and defendant involved in the fighting. She denied telling the police that only Gilliam and Morris were involved. She identified defendant in court and testified that she knew him from the neighborhood. Defendant's grandmother testified that on Easter Sunday in 2006, the date of the incident, defendant had been wearing a blue sweater.
Police officers testified that when they were searching Gilliam's apartment, an officer overheard a phone call between Gilliam's brother William, who was present in the apartment during the search, and Gilliam, who was evading the police, in which Gilliam asked William if the police were there and told William to get rid of "the shirt."
Gilliam testified as follows. After the shooting, he saw Morris, his brother William, defendant and defendant's girlfriend in the lobby of his apartment building, and defendant took off the blue sweater once inside the apartment and told Gilliam to hold two guns, Morris's .357 caliber and defendant's 9 millimeter. A friend called Gilliam and told him that the police were looking for someone matching his description for a shooting, and Gilliam relayed this information to defendant. Defendant told him to get rid of the blue sweater and guns, so Gilliam took the guns to a nearby crack house but left the sweater behind in the apartment. Gilliam attempted to go home, but he learned that the police were at his building. When defendant later called to confirm that Gilliam had gotten rid of the sweater, Gilliam told him that he forgot. Gilliam then went to the home of one of defendant's friends, as directed by defendant, where defendant told him they would flee to North Carolina. That night, Gilliam, defendant, defendant's girlfriend and defendant's son went to North Carolina in a blue car. In North Carolina, they stayed in several hotels and homes, changing location each night. Gilliam cut his hair to alter his appearance and threw away his cell phone. Defendant later told Gilliam that he heard that Morris had told police that Gilliam committed the shooting. He told Gilliam to return to New York and to tell police that Morris was the shooter. Defendant promised to hire Gilliam a lawyer. Gilliam then returned to New York.
Thereafter, Gilliam met with detectives and identified Morris as the shooter. However, Gilliam testified that this first identification of Morris was untrue and that when he learned that Morris had not implicated him in the crime, as defendant had suggested, Gilliam gave a second, truthful statement to detectives that defendant was the actual shooter, not Morris. Gilliam then made a third statement at the District Attorney's Office with his attorney present that defendant was the shooter and that Gilliam had disposed of the murder weapon. Gilliam was thereafter arrested and charged with hindering prosecution and tampering with physical evidence.
As an initial matter, we find that the verdict was supported by legally sufficient evidence and was not against the weight of the evidence. "A verdict is legally sufficient when, viewing the facts in the light most favorable to the People, there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt'" (People v Danielson, 9 NY3d 342, 349 [2007]). "A sufficiency inquiry [*3]requires a court to marshal competent facts most favorable to the People and determine whether, as a matter of law, a jury could logically conclude that the People sustained its burden of proof" (id.). When assessing a weight of the evidence claim, the appellate court must first ascertain "[i]f based on all the credible evidence a different finding would not have been unreasonable" (People v Bleakley, 69 NY2d 490, 495 [1987]). If so, then the court must, "like the trier of fact below, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony'" (id.). Although this Court has the authority to set aside the verdict if it determines that the jury "failed to give the evidence the weight it should be accorded," it should not substitute itself for the jury, as "[g]reat deference is accorded to the fact-finder's opportunity to view the witnesses, hear the testimony and observe demeanor" (id.).
The verdict was supported by legally sufficient evidence and was not against the weight of the evidence because the People proved, through their witnesses and forensic evidence, that defendant was correctly identified as the shooter, the only issue at trial. First, the People provided evidence that defendant was the shooter with the blue sweater containing DNA matching defendant's DNA and not the DNA of Morris or Gilliam. Several different witnesses testified that the shooter was wearing a blue sweater during the fight and the shooting. Although there were slight variations in the description of that item of clothing, with one witness describing it as a blue short-sleeved shirt or polo, most of the eyewitnesses described it as a blue sweater. Both Gist and defendant's grandmother testified that on the day of the shooting, defendant was wearing a blue sweater. Finally, one of the detectives testified that the bag containing the blue sweater smelled of gunpowder residue when he recovered it from Gilliam's apartment several hours after the shooting and that he overhead Gilliam tell his brother to discard the sweater.
Further, the People provided evidence that defendant was the shooter with the overwhelming evidence demonstrating defendant's consciousness of guilt. This evidence included that defendant fled to North Carolina shortly after the incident with his girlfriend, his son and Gilliam; that the group stayed in several hotels and homes, changing location each night; that defendant leased a residence under a false name; that defendant sent Gilliam to New York to implicate Morris as the shooter; that defendant continued to hide out in North Carolina with his girlfriend, despite the fact that defendant owned a music studio in New York and defendant's girlfriend worked as a paramedic in New York; and that defendant was ultimately apprehended in North Carolina avoiding law enforcement.
Additionally, the People provided evidence that defendant was the shooter with the testimony of multiple witnesses that the shooter had a tattoo on his right arm and showed the jury that defendant did indeed have a tattoo on his right arm. Moreover, the People introduced at the trial the video of Morris's interview at the News 12 Bronx office showing that Morris had no tattoos on his arms.
Finally, the People provided evidence that defendant was the shooter with Gilliam's testimony that he had identified defendant as the shooter and that defendant asked him to get rid of the blue sweater that was later found by police in Gilliam's apartment and that contained DNA matching that of defendant. Additionally, Gilliam provided credible testimony as to why he initially identified Morris as the shooter instead of defendant. He stated that he only identified Morris as the shooter at the behest of defendant after defendant told him that Morris had implicated him in the crime. However, once he learned that Morris had not implicated him in the crime, he told detectives the truth, that defendant was actually the shooter.
The assertion that Gilliam's testimony should be rejected because he was defendant's accomplice and a cooperating witness is without merit. An accomplice's testimony can be used to support a defendant's conviction if it is corroborated by other evidence (see People v Besser, 96 NY2d 136, 143-144 [2001]). "Independent evidence need not be offered to establish each element of the offense or even an element of the offense; the People's burden is merely to offer some nonaccomplice evidence tending to connect' defendant to the crime charged" (id.). In addition to Gilliam's testimony that defendant was the shooter, the People elicited testimony from other witnesses who identified defendant as being involved in the altercation and testified [*4]that the shooter wore a blue sweater, and provided physical and forensic evidence, including the blue sweater found in Gilliam's apartment, which contained defendant's DNA. All of this evidence corroborated Gilliam's testimony and connected defendant to the crime charged.
The fact that Morris was initially mistakenly prosecuted for the murder and that several witnesses initially identified Morris as the shooter does not alter the conclusion that the verdict was supported by legally sufficient evidence. The misidentifications by the witnesses were explained by the circumstances, including that they may have seen Morris's name and face through media coverage of the murder before they made their identifications. Moreover, at the trial, defense counsel emphasized the theory that Morris had committed the shooting and the jury properly rejected that theory based on the trial evidence.
The court properly permitted the People to introduce portions of Morris's plea allocution, in which he pleaded guilty to weapon possession and admitted that at the time and place of the murder, he possessed a .357 caliber handgun. Morris did not testify at defendant's trial and his plea allocution would normally be inadmissible as testimonial hearsay. However, the admission of portions of Morris's plea allocution did not violate defendant's right of confrontation because defendant opened the door to this evidence (see generally People v Reid, 19 NY3d 382, 387 [2012]). During the trial, defendant created a misleading impression that Morris possessed a 9 millimeter handgun, which was consistent with the type used in the murder, and introduction of the plea allocution was reasonably necessary to correct that misleading impression.
Defense counsel failed to preserve any claim that the court precluded him from calling the court reporter who transcribed the 2007 grand jury minutes of the testimony of Brenda Gonzalez, a witness to the incident who had attempted to break up the fight between the shooter and her friend, and we decline to review it in the interest of justice. As an alternative holding, we find that the court properly precluded defense counsel from calling the 2007 grand jury reporter.
The facts as they relate to Gonzalez are as follows. Shortly after the shooting, Gonzalez identified Morris in a lineup. She testified as to her interactions with Morris in both a 2006 grand jury proceeding and a 2007 grand jury proceeding. During her testimony in the 2006 grand jury proceeding, Gonzalez did not mention Morris by name. However, during her testimony in the 2007 grand jury proceeding, Gonzalez did mention Morris by name.
At defendant's trial, during cross-examination by defense counsel, Gonzalez testified that she never previously identified Morris by name. Defense counsel then asked if she recalled answering a question in the grand jury "back in 2006" in which she identified Morris by name. Gonzalez responded that she "never said that" and claimed that someone must have inserted Morris's name into the transcript. Defense counsel then attempted to impeach her by reading from Gonzalez's 2007 grand jury testimony, in which Gonzalez had identified Morris by name. However, defense counsel never questioned Gonzalez about her 2007 grand jury testimony before attempting to impeach her testimony with the 2007 grand jury transcript. The prosecutor objected to defense counsel impeaching Gonzalez with the 2007 grand jury transcript, and the court sustained the objection at that time.
The prosecutor then stated that he was going to call the court reporter who transcribed the 2006 grand jury minutes because those were the only grand jury minutes about which defense counsel questioned Gonzalez and the 2006 grand jury minutes did not make any reference to Gonzalez identifying Morris by name. Defense counsel then admitted on the record that perhaps he had made a mistake as to which grand jury proceeding he questioned Gonzalez about, but he asserted that the difference in dates did not matter. Defense counsel requested that the jury be told that the statements he read and that were attributed to the 2006 grand jury proceeding were actually made by Gonzalez during the 2007 grand jury proceeding. However, the prosecutor refused on the ground that Gonzalez had not been properly confronted with the 2007 transcript because defense counsel never questioned Gonzalez about her 2007 grand jury testimony.
The prosecutor then called the 2006 grand jury reporter, who testified that Gonzalez did not mention Morris at that proceeding. Thereafter, defense counsel made an application to the court to call the 2007 grand jury reporter. The court did not make a ruling on defense counsel's request. Instead, it advised the parties to prepare to address the issue at some point in the future. For the remainder of the trial, defense counsel never sought to obtain a ruling from the court on [*5]whether he could call the 2007 grand jury reporter and he also never made an application to the court to recall Gonzalez as a witness to question her properly about her 2007 grand jury testimony.
During jury deliberations, the jurors requested a portion of the 2006 grand jury reporter's testimony. At that point, defense counsel argued that the jury was left with an inaccurate and unfair impression about Gonzalez's testimony because he was precluded from calling the 2007 grand jury reporter. The court noted defense counsel's "exception."
Based on the foregoing, we find that defendant abandoned and failed to preserve his claim that he was denied the right to call the 2007 grand jury reporter in order to properly confront Gonzalez (see e.g. People v Martinez, 257 AD2d 479, 480 [1st Dept 1999], lv denied 93 NY2d 876 [1999]). The court never actually ruled against defendant on the issue of whether he could call the 2007 grand jury reporter. Rather, the court stated that it would have to think about it. However, defense counsel did not seek a subsequent ruling on this issue during the testimonial portion of the trial. It was not until the jury asked a question about the 2006 grand jury reporter's testimony that defense counsel raised the issue again about wanting to call the 2007 grand jury reporter. Defendant's untimely request, during jury deliberations, to call the 2007 grand jury reporter did not preserve his claim (see e.g. People v Guilliard, 309 AD2d 673 [1st Dept 2003], lv denied 1 NY3d 597 [2004]).
Our alternative holding is that the court properly precluded defense counsel from calling the 2007 grand jury reporter in order to impeach Gonzalez because defendant never properly confronted Gonzalez with her 2007 grand jury testimony before seeking to call the 2007 grand jury reporter. Despite being made aware that he mistakenly questioned Gonzalez about her 2006 grand jury testimony, defense counsel never questioned Gonzalez about her 2007 grand jury testimony and never made an application to the court to recall Gonzalez to question her properly about her 2007 grand jury testimony.
None of the other evidentiary rulings challenged by defendant warrant reversal. These various rulings were provident exercises of the trial court's discretion in admitting and excluding evidence, in which the court exercised its discretion in accordance with the applicable legal standards relating to each issue. We find that none of these rulings deprived defendant of a fair trial, or of his right to present a defense. Defendant failed to preserve his challenges to the prosecutor's opening statement and summation by failing to object, or by failing to request further relief after the court sustained an objection and gave a curative instruction, and we decline to review them in the interest of justice. As an alternative holding, we find no basis for reversal (see People v Overlee, 236 AD2d 133 [1st Dept 1997], lv denied 91 NY2d 976 [1998]; People v D'Alessandro, 184 AD2d 114, 118—119 [1st Dept 1992], lv denied 81 NY2d 884 [1993]).
The court did not violate defendant's right to be present when, following his outburst upon hearing the guilty verdict, it immediately ordered him removed from the courtroom before the jury was polled. Earlier in the trial, the court had warned defendant that any further outbursts by him would result in his removal from the courtroom while his trial continued (see People v Branch, 35 AD3d 228, 228-229 [1st Dept 2006], lv denied 8 NY3d 919 [2007]).
The court properly declined to dismiss the indictment based on the People's decision not to present evidence to the grand jury about Morris, the person who had originally been charged with the murder. The prosecution has broad discretion in presenting its case to the grand jury and is not obligated to present exculpatory evidence (People v Mitchell, 82 NY2d 509, 515 [1993]).
The court properly declined to hold a hearing pursuant to Franks v Delaware (438 US 154 [1978]) to address the validity of statements made in the affidavit filed in support of the search warrant for defendant's DNA swab. Defendant failed to show that the affidavit was "knowingly false or made in reckless disregard of the truth" (People v Tambe, 71 NY2d 492, 504 [1988]).
The court properly denied defendant's constitutional speedy trial motion after considering the factors enumerated in People v Taranovich (37 NY2d 442 [1975]).
The court providently exercised its discretion in denying defense counsel's request for an adjournment of sentencing to allow the defense to further investigate an alleged jury issue, and the ruling did not result in any prejudice (see People v Rivera, 157 AD3d 545 [1st Dept 2018], lv [*6]denied 31 NY3d 1016 [2018]).
We perceive no basis for reducing the sentence.
All concur except Manzanet-Daniels, J. who
dissents in a memorandum as follows:




MANZANET-DANIELS, J. (dissenting)


I do not believe that defendant's identity as the shooter was proven beyond a reasonable doubt. At a minimum, he is entitled to a new trial. Defendant was prejudiced when he was prevented from cross examining an eyewitness concerning her prior identification of another man, Nicholas Morris, as the shooter, and the prosecution was allowed to elicit testimony from the grand jury reporter in 2006 that left the impression that the witness had never previously identified another man as the shooter. I therefore dissent.
Witnesses had occasion to observe Ronnell Gilliam, a/k/a "Burger," and another man, described as a "taller" and "slimmer" man, in broad daylight, at close range, for a 10-minute period during the initial encounter. Words were exchanged, and the men engaged in a fistfight. When the fight broke up, John Erik gave chase but was unable to catch up with the slender man. When he encountered Gilliam on the way back to his friends, he was threatened that he was "going to get shot for that." The slim man returned in a car with a gun. Witnesses testified that the slim man pointed the gun at Juan Carlos, who was just emerging from a store, and began shooting.
During a canvass following the shooting, detectives interviewed a witness who saw the altercation but not the initial shooting. She identified Gilliam and Nicholas Morris as the two men she saw.
Three of the four witnesses present identified Nicholas Morris — who does not resemble defendant — as the shooter in a lineup two days after the shooting [FN1]. Another witness from the neighborhood who viewed a photo array stated that Morris "look[ed] like the shooter."
The eyewitness identifications, together with a 9 millimeter cartridge (of the same type recovered from the victim), recovered during a search of Morris' apartment, furnished probable cause to arrest Morris and charge him with the murder. Morris was observed to have bruising on his knuckles, indicating to detectives that he had recently been in a fight.
Defendant was not arrested until 2013, some seven years after the murder. He was never identified by any of the initial eyewitnesses as the shooter. The only witness who identified defendant as the shooter at trial was Gilliam, the accomplice. Accomplice testimony lacks the inherent trustworthiness of the testimony of a disinterested witness and must be viewed with a "suspicious eye," particularly where, as here, the accomplice hopes to receive immunity or lenient treatment (see People v Berger, 52 NY2d 214, 218-219 [1981]). Such testimony must be regarded with "utmost caution" (id. at 219). Not only was Gillam a cooperating witness seeking to avoid a murder sentence,[FN2] but he also changed his story repeatedly. First, he identified Morris as the shooter. Later, and apparently at the behest of Morris,[FN3] his best friend, he identified defendant as the shooter. By Gilliam's own admission, he failed to tell the police that Morris had a .357 for fear of "implicating him." He admitted that he lied when he said defendant threw the gun in the river. He testified that he had "come clean" during his third interview with the police, but admitted on cross that he had lied about disposing of the gun in the river himself.
Significantly, while eyewitnesses described the shooter's sweater/shirt as blue, not one of [*7]them was able to identify the blue garment in evidence as the one worn by the shooter [FN4]. The sweater had been turned over by Gilliam's brother during a search of the apartment. The investigating detective testified that he smelled gunpowder when he opened the bag containing the sweater. Yet Gilliam's brother was never called as a witness, despite being available; no gunpowder or residue consistent with the discharge of a firearm was detected on the shirt, although it was examined for trace evidence shortly after the incident; and the detective did not record his observation in the contemporaneous DD-5 report or any of the paperwork in the case, despite what he agreed was its obvious significance.
In its recitation of the events of the day in question, the majority does not sufficiently differentiate the initial, 10-minute encounter from the subsequent, fatal encounter during which the shooter and his friends returned in a car. The sequence of events is critical, however, because none of the eyewitnesses was able to identify defendant as the shooter during the second, fast-moving encounter. They testified only that the shooter wore a blue sweater/shirt. The prosecution thus relied on a theory that the blue-shirted shooter was the same slim man as had been observed during the initial encounter. Enough time elapsed between the encounters, however, that he simply cannot be presumed to be the same person.
The majority also implies that Gist identified defendant as the shooter; however, she did no such thing. Gist admitted that she observed only the initial encounter and did not observe the shooting. Further, during a canvass following the shooting, she identified Gilliam and Morris as the two individuals she saw during the initial encounter.
Defendant was denied his right to confrontation when the court prevented counsel from cross-examining a critical witness to establish that she had identified Morris unequivocally as the shooter in testimony before the grand jury in 2007. The witness had testified before the grand jury twice, in 2006 and 2007; the latter time she identified Morris by name as the shooter.
When the witness maintained at trial that she never identified Morris as the shooter before the grand jury, defense counsel attempted to impeach her with prior inconsistent statements she made to the grand jury in 2007. Defense counsel asked the witness whether she wouldn't agree that events were fresh in her mind when she testified before the grand jury in "2006," referring to the incorrect year, but reading verbatim from the transcript of the 2007 proceedings, in which the witness unequivocally identified Morris as the slender man involved in the shooting.
The People asked to call the grand jury reporter from 2006 so that the jury would be left with the mistaken impression that the witness had identified Morris by name as the shooter in 2006. Defense counsel asked that the jury be instructed that the statements he cited during cross-examination of the witness had been made in the 2007 proceedings so as not to leave an unfair impression that the statements had never been made. The prosecutor objected and refused to so stipulate, asserting that defense counsel had "made specific reference to 2006, and that is what is in the record."
The People called the 2006 reporter as a witness, eliciting testimony via extended question-and-answer that left the jury with the distinct impression that the witness had never identified Morris as the shooter, as defense counsel had suggested during his cross examination. This testimony had the effect of vouching for an untruthful witness and subverting what was in fact the truth — that the witness had identified Morris, albeit in 2007 — and left the jurors with the impression that defense counsel himself was being disingenuous.
When proceedings reconvened, defense counsel again asked that the jury be instructed or informed that the passages he had read were accurate reflections of the witness's testimony before the grand jury in 2007. The prosecutor opposed, asserting that defense counsel had never properly confronted the witness with her 2007 statements. The court was inclined to agree, noting that "because the witness was not impeached by reference expressed to 2007 and because [*8]the questions could reasonably be interpreted as being 2006 grand jury testimony, there is no basis for calling the stenographer from 2007."
The court's ruling left the jury with the impression that the witness had never previously identified Morris as the shooter and that the defense was fabricating evidence. The jury indeed appeared to be confused as it twice asked to rehear the 2006 court reporter's testimony concerning the witness's prior testimony.
While the court initially appeared to recognize that it would be unfair for the jury to hear only a portion of the eyewitness's prior testimony, that is exactly what transpired when the court allowed the testimony of the 2006, but not the 2007 court reporter. The prosecutor argued extensively during summation that defense counsel had attempted to mislead the jury when he "tried to get Brenda Gonzalez to admit she said things before a grand jury in 2006 that she never said . . . That's why [the People] had to call the grand jury reporter to prevent the facts from being manipulated." These arguments were designed to mislead the jury to conclude that the witness had never identified Morris under oath to the grand jury. Indeed, the jury never learned that the witness had identified Morris as the shooter under oath at the 2007 grand jury proceeding. The failure to allow cross-examination of the witness concerning her prior identification of Morris as the shooter deprived defendant of a fair trial, which warrants reversal and remand for a new trial (see People v McLeod, 122 AD3d 16 [1st Dept 2014]).
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: JUNE 11, 2019
CLERK



Footnotes

Footnote 1:The fourth was unable to make an identification.

Footnote 2:Gilliam was promised a five-year sentence in exchange for his cooperation.

Footnote 3:Witnesses testified that Morris called Gilliam and spoke to him while Gilliam was being interviewed at the police station.

Footnote 4:Details also varied by witness, from "polo shirt" to "sweater" and from long-sleeved to short-sleeved. Some described the shirt as having a logo or "embroiderment" design; others did not observe a logo or design.